No. 72,890

OLATHE MANUFACTURING, INC., *Appellee/Cross-Appellant,* v. BROWNING MANUFACTURING, EMERSON POWER TRANS-MISSION CORPORATION, *Appellant/Cross-Appellee.*

(915 P.2d 86)

Opinion filed April 19, 1996.

*James M. Warden*, of Blackwell Sanders Matheny Weary & Lombardi L.C., of Overland Park, argued the cause, and *William H. Sanders, Victoria H. Bonavia,*

and *Shelley A. Runion*, of the same firm, were with him on the briefs for appellant/cross-appellee.

*John M. McFarland*, of Gage & Tucker L.C., of Overland Park, argued the cause, and *William L. Turner*, of the same firm, was with him on the brief for the appellee/cross-appellant.

The opinion of the court was delivered by

ABBOTT, J.: The plaintiff in this case is Olathe Manufacturing, Inc. (Olathe). The remaining defendant is Browning Manufacturing, Inc., (Browning), a division of Emerson Power Transmission Corporation. Olathe designs, manufactures, and sells cutters, chippers, and tub grinders. Browning manufactures bearings and sells the bearings to distributors, including Bearing Headquarters Company (BHQ). Olathe purchased Browning bearings from BHQ as a component part for a new product which Olathe designed and sold, the 866 Tub Grinder. The bearings failed, causing the tub grinders to malfunction.

Olathe sued Browning and BHQ for breach of express warranty, breach of implied warranty of merchantability, and breach of implied warranty for a particular purpose. BHQ settled for $100,000 before the trial began. Browning answered and raised affirmative defenses, including failure to state a claim, warranty disclaimers, and limitation of remedies.

The trial court found, as a matter of law, that even though Browning was not in privity with Olathe, Browning could still be liable to Olathe for breach of implied warranties. The trial court also held, as a matter of law, that Browning's warranty disclaimer and limitation of remedy provisions were not binding on Olathe, finding that the defenses could not be presented to a jury and removing them from the case. Further, the trial court excluded evidence which Olathe attempted to offer in order to prove lost profits which it allegedly suffered.

After a 5-week trial, the jury found that all three warranties had been breached and returned a verdict in Olathe's favor for $812,289. However, the trial court reduced the jury's damages award by $100,000, the amount of Olathe's pretrial settlement with defendant BHQ, and entered judgment in the amount of $712,289.

Browning appeals from the trial court's ruling which removed its affirmative defenses from the case as not applicable to Olathe and from the accompanying jury verdict. Olathe cross-appeals, challenging the trial court's lost profit ruling.

## I. BROWNING'S LIMITATION OF REMEDY PROVISION.

Browning does not appeal the trial court's presentation of the express warranty question to the jury or the jury's finding that Browning breached express warranties. Browning contends, however, that the damages awarded to Olathe for breach of such express warranty should have been restricted by its limitation of remedy provision found in the Browning catalog.

The trial court found as a matter of law that this remedy limitation did not apply to Olathe and that any damages which the jury might award to Olathe for breach of warranty should not be limited by the remedy limitation because Olathe had no knowledge of and had not assented to the remedy limitation. Browning contends that the trial court was in error to remove this defense from the case.

Browning also contends that the trial court was in error to present the implied warranty issue to the jury because Browning could not convey or breach implied warranties to Olathe as it did not have privity of contract with Olathe, and Olathe suffered only economic loss. Further, Browning objects to the trial court's removal of its warranty disclaimer from the case.

However, the remedy limitation provision is the only warranty issue in the case which needs to be analyzed. The implied warranty claim does not need to be addressed because this court affirms the trial court and finds that Browning's remedy limitation does not apply to Olathe as a matter of law; thus, the validity of the implied warranty claim is moot. Even if Browning is correct and the jury's finding that Browning breached implied warranties should be set aside because Browning was a non-privity seller, the jury still found that Browning breached an express warranty. With the lack of a valid remedy limitation, the jury would have awarded the same amount of damages for the breach of an express warranty, regardless of the implied warranty claims. Hence, the implied warranty claim is moot.

Since the implied warranty claim is moot, it is not necessary to analyze the warranty disclaimer as it only applied to the implied warranty. Browning does not contend that the express warranty was disclaimed by the warranty disclaimer. In fact, Browning does not even appeal the jury's finding that it breached an express warranty. Browning simply contends that the damages for breach of an express warranty should have been limited to repair and replacement, as its remedy limitation provides. Further, our discussion of Browning's remedy limitation does not include a discussion of the warranty limitation because as Rasor & Baker, Kansas Law of Sales Under the Uniform Commercial Code p. 9-21 (1982) states: "[I]t is essential that the lawyer distinguish between exclusions (or disclaimers) of warranty responsibility and limitations on remedies. The Code deals with each of these in different ways, and confusion of the two concepts has caused problems for both judges and lawyers."

In analyzing the remedy limitation, it is important to understand the relationship between Browning, BHQ, and Olathe and how the remedy limitation fits into this relationship. Olathe did not purchase Browning's bearings directly from Browning. Instead, Olathe ordered the Browning products from an independent distributor, BHQ. All contracts between Browning and BHQ for the bearings in question included a limitation of remedy provision. Further, Browning published a product catalog, and each new edition of the catalog contained the following sales terms:

"WARRANTY. All BROWNING products are warranted against defects in workmanship and materials for one year from date of shipment. This constitutes BROWNING'S only warranty in connection with this sale, and is in lieu of all other warranties, express or implied, written or oral. THERE ARE NO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE THAT APPLY TO THIS SALE. No employee, agent, dealer, or other person is authorized to give any warranties on behalf of BROWNING, nor to assume for BROWNING any other liability in connection with any of its products, except an officer of BROWNING, in a signed writing.

"LIMITATION OF REMEDY. BROWNING will repair or replace, at BROWNING's option, F.O.B. Factory, freight prepaid, any BROWNING product proved defective in workmanship or materials if immediate written notice of claim is made to BROWNING by purchaser within one year from date of ship-

ment. It is agreed that such replacement or repair is the exclusive remedy available from BROWNING should any of BROWNING's products prove defective. BROWNING is not liable for damage of any sort whatsoever, including incidental or consequential damages. Browning will not be liable for delay caused by said defects and will not be responsible for work or repairs done by others."

Any new products which Browning introduced between printings of the catalog were described in a product brochure. The brochure did not contain a remedy limitation provision. However, when Browning published a new edition of the catalog containing the remedy limitation, it would incorporate the preceding brochures into the catalog. Further, Browning points out that the remedy limitation provided in the catalog stated that it applied to any Browning products.

When BHQ sold the bearings to Olathe, BHQ did not disclaim any warranties or limit its liability. However, throughout BHQ's sales relationship with Olathe, BHQ provided Olathe with copies of each new edition of the Browning product catalog which contained the limitation of remedy provision. Olathe never received a Browning product catalog from Browning itself; rather, it received the catalog from its parts vendors such as BHQ. Olathe kept over 500 manufacturer catalogs in the engineering department of its plant. Browning introduced at least one of the other manufacturer's catalogs into evidence at trial, and it included a remedy limitation similar to the one found in Browning's catalog. Olathe's engineering manager, William E. Daniels, Jr., kept several copies of the Browning catalogs at his office and home. Daniels testified that Olathe used the Browning catalogs to order thousands of Browning products from BHQ over the years prior to purchasing the bearings involved in this case. Olathe engineers used the catalogs to determine the product description and specifications. Once the Olathe engineers ordered a part from a vendor for an initial product prototype, the Olathe purchasing department ordered all future parts for that product based upon a bill of material specified by the engineers for that product. Olathe's purchasing department did not have, use, or order from catalogs.

At trial, all of Olathe's representatives, including Daniels, denied seeing Browning's remedy limitation provision. Daniels testified

that he used and looked at the catalog at least once a month and that nothing prevented him from seeing the remedy limitation provision. Daniels admitted that he knew businesses such as Olathe and Browning commonly used sales terms similar to Browning's terms. In fact, Olathe's manual for the 866 Tub Grinder, the product which used the Browning bearings at issue as component parts, included a similar remedy limitation.

Olathe's president testified that "as a matter of common practice, I don't read [vendor's] warranties," but he agreed that Browning's terms of sale were available to read had he wanted to read them. Olathe's president testified that the wording of Browning's sales conditions is common. Olathe's president further testified that he knew it was "common" for manufacturers to include such terms in their warranties, and that he worded Olathe's own limitation of liability for Olathe's products "after others that I had seen."

On November 20, 1990, Daniels used a Browning product catalog, with the standard remedy limitation, to select a Browning 1000 Series bearing for the new 866 Tub Grinder which Olathe was designing. Daniels placed an order with BHQ for the Browning 1000 Series bearings. Before ordering the Browning bearing, Daniels made the necessary engineering calculations, without consulting anyone from Browning or BHQ, and determined that the Browning 1000 Series bearing would be appropriate for the Olathe tub grinder.

Wayne Barber has been a district manager for Browning in the Kansas City area since 1989. Barber served as a technical advisor regarding Browning products to BHQ's customers in the region. Since 1989, Barber had been visiting Olathe on the average of about once a month to provide technical assistance. In fact, after 1990, Barber visited Olathe more than most of his other customers. Olathe's two engineers were not experienced in bearings and regularly relied on Barber for technical assistance regarding the bearings. Although Barber is not an engineer, Barber testified that he knew more about Browning products than anyone else in the Kansas City metropolitan area.

In November or December of 1990, Daniels had a conversation with Barber concerning the type of bearing which Daniels had ordered for the 866 Tub Grinder. This was the first time that Daniels advised Barber of his (Daniels') earlier selection of the 1000 Series bearing for the tub grinder. Daniels told Barber that Olathe wanted to install the best, strongest, huskiest bearing in the 866 Tub Grinder. After discussing the design of the tub grinder with Daniels, Barber told Daniels about a new Browning bearing, the 1100 Series. Barber told Daniels that the 1100 Series bearing was just like the 1000 Series bearing which Olathe had already ordered for the tub grinder except the 1100 Series bearing was superior in that it had a ductile iron housing which was stronger than the cast iron housing on the 1000 Series bearing. Therefore, Barber told Daniels that the 1100 Series bearing would be able to withstand stress better.

When Barber talked to Daniels about the 1100 Series bearing, Barber did not have any written product information with him regarding the 1100 Series bearing. Barber told Daniels that he would provide Daniels with literature on the 1100 Series bearing. Data on the new 1100 Series bearing was not in any of the current Browning catalogs as it was a product which had been introduced by Browning since the last catalog had been issued. The 1100 Series bearing was described in a product brochure which did not contain the remedy limitation as the regular catalog editions did.

Barber testified that he returned to Olathe about a week later with a product brochure for the 1100 Series bearing. After examining the bearing specifications in the brochure, Daniels decided to change Olathe's preexisting order with BHQ for the 1000 Series bearings to the 1100 Series bearings. After Daniels agreed to install the new bearing in Olathe's 866 Tub Grinder, Barber called BHQ and instructed BHQ to amend Olathe's prior order with BHQ for the purchase of the 1000 Series bearings to reflect 1100 Series bearings. Browning and Olathe did not enter into a contract with each other; rather, Olathe entered into a contract to purchase Browning 1100 Series bearings from BHQ. Barber never discussed or drew Olathe's attention to any remedy limitations on Browning products. The documents and papers accompanying the 1100 Se-

ries bearings did not contain any reference to a remedy limitation. There were not any remedy limitation provisions contained in the documents of sale between BHQ and Olathe.

After the bearings failed, Olathe sued Browning for breach of express warranties pursuant to K.S.A. 84-2-313. In its petition, Olathe alleged Browning expressly warranted that the 1100 Series bearing would be suitable for the tub grinder, through its representative Barber and through the product brochure, and that these warranties were breached. Apparently, the jury believed this theory because it found, *inter alia*, that Browning had breached an express warranty and awarded Olathe $812,289 in damages. However, in making this finding, the jury did not consider the remedy limitation found in the Browning catalog. The trial court refused, as a matter of law, to instruct the jury on Browning's affirmative defense regarding the remedy limitation. According to the trial court, Browning had proffered no evidence that Olathe was aware of the remedy limitation provision in the Browning catalog or that Olathe had assented to such provision. The trial court made this ruling after it had heard all the evidence and was making a determination as to jury instructions. It stated:

"THE COURT: My determination is absent any contractual writings between BHQ or—excuse me—between Browning and Olathe, *the Browning limitation of remedies in the sales catalog is not binding on Olathe.* I left open the issue of whether there was any evidence in the record where that limitation was pointed out to anybody at Olathe, and there was nothing from which the Court could infer some type of agreement between the two of them that the sale would be based on that limitation, and there was nothing that I knew in the record that would show or manifest any assent between Olathe and Browning that they are buying subject to a limitation of remedies in the Browning catalog.

"I understand the arguments on constructive notice and so forth as contained in the UCC, but it is my determination that it would have been a simple matter for BHQ to incorporate by reference the Browning limitation from the catalog into its invoicing or, otherwise, restate whatever limitation of remedies were appropriate in its paperwork documenting the sale between the BHQ and Olathe. Apparently, there is no such limitation of remedies in that paperwork, and as a threshold matter in determining whether we have notice, there is no contract there between the parties containing that limitation of remedies.

. . . .

"MR. WARDEN: So the Court's determination is as a matter of law the contract limitations and disclaimers are not in Browning's catalog are not binding on the plaintiff.

"THE COURT: Yes, absent an agreement which I cannot find any evidence to support. . . ."

The district court also found as a matter of law that Browning's remedy limitation provision in its regular catalog was conspicuous.

This court's review of conclusions of law is unlimited. *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991).

Browning points out that its remedy limitation was included in all Browning invoices to BHQ between 1990 to 1993. Specifically, the remedy limitation was included as a term in the contract between Browning and BHQ for the sale of the 1100 Series bearing which BHQ later sold to Olathe. Further, Browning asserts that remedy limitation was conspicuously placed in the Browning catalog which BHQ distributed to Olathe.

Browning does not appeal the jury's finding that it breached an express warranty. Rather, Browning argues that if it breached an express warranty, either by the oral warranty made by the Browning representative or the product description found in the product brochure, then the remedies for breach of such warranty are limited to repair and replacement based on the remedy limitation found in the Browning catalog.

Browning points out that K.S.A. 84-2-316(4) and K.S.A. 84-2-719(1) allow remedies for the breach of a warranty to be limited.

K.S.A. 84-2-719(1)(a) states:

"[T]he agreement . . . may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts."

Thus, Browning contends that its limitation of remedies provision is proper. K.S.A. 84-2-316(4); 84-2-719(3); see *Kansas City Structural Steel Co. v. L.G. Barcus & Sons, Inc.*, 217 Kan. 88, Syl. ¶ 3, 535 P.2d 419 (1975) (consequential damages may be excluded in a commercial sales agreement unless unconscionable). Olathe does not contest that the remedy limitation was properly authorized by common law and/or the Uniform Commercial Code (UCC). Olathe

simply contends that the trial court was correct in finding that the limitation did not apply to Olathe as a matter of law. Browning contends the trial court erred in one of two ways. One, Browning contends that the trial court was incorrect because the remedy limitation did apply to Olathe as a matter of law. Alternatively, Browning contends the trial court was incorrect because the jury should have been allowed to hear the remedy limitation defense and determine as a question of fact whether the remedy limitation applied to Olathe.

## Constructive Notice

Browning points out that the contract it had with BHQ clarified that Browning was not liable for incidental and consequential damages. According to Browning, it only accepted the risk of products failing within the scope of this limited remedy. Any damages beyond repair and replacement were to be borne by BHQ. Thus, Browning priced its bearings low accordingly. Browning contends that Olathe had constructive notice of this risk allocation because Olathe possessed the Browning product catalogs which included the remedy limitation. Further, when Olathe purchased the 1100 Series bearing from BHQ, BHQ did not limit Olathe's available remedies should BHQ breach a warranty. Thus, according to Browning, Olathe bargained for and obtained the right to pursue a remedy for all incidental and consequential damages from BHQ should the bearings fail. Olathe settled with BHQ prior to trial. Thus, Browning contends that the trial court allowed Olathe to impose damages on Browning beyond repair and replacement even though BHQ had accepted this risk in its contract with Browning.

According to Browning, the trial court found that the jury could only be instructed on the limitation as a defense if Browning could show some evidence that Browning had "directly pointed out" the remedy limitation to Olathe or if Browning could prove that Olathe had actual knowledge of the remedy limitation. Browning asserts that the trial court erred in imposing an actual knowledge standard. Browning contends that Olathe was bound by Browning's limitation of remedy provision even if Olathe did not have actual knowledge of the provision because Olathe had constructive knowledge

of the remedy limitation before Olathe decided to purchase the bearings.

Browning claims that Olathe had constructive knowledge of the remedy limitation because the limitation was displayed in Browning's product catalogs which were distributed to Olathe by BHQ. Olathe possessed and used several copies of the catalog to order thousands of Browning's products prior to the bearings order at issue. In fact, Olathe ordered its initial bearing selection, the 1000 Series, out of such a catalog. The product brochure which contained the 1100 Series bearings did not include a remedy limitation and did not refer Olathe to the catalog containing the remedy limitation. However, the remedy limitation in the regular catalog which Olathe possessed stated that it applied to any Browning product. Olathe's president testified that he knew it was common practice for manufacturers to include remedy limitations in their warranties and that the provision was available to read if he so chose. Further, Browning points out that the trial court found the remedy limitation to be conspicuous as a matter of law. Thus, Browning contends that even if Olathe had never read the remedy limitation, it should have been charged with constructive knowledge of the conspicuous limitation, thereby making the limitation apply to Olathe as a matter of law.

In making this argument, Browning cites to K.S.A. 1995 Supp. 84-1-201(10) which makes it clear that the determination of conspicuousness is a decision of law to be made by the court.

The fact that the trial court found the limitation was conspicuous is irrelevant. In fact, the trial court stated that it understood the constructive notice arguments under the UCC, but found that they did not apply here.

The authority regarding whether a limitation of remedies provision applies to a particular party under the UCC or under the common law is minimal. Thus, authority which addresses whether an express warranty applies to a party or becomes a "part of the basis of the bargain" between two parties may be helpful in addressing this issue.

K.S.A. 84-2-313(a) defines an express warranty as "[a]ny affirmation of fact or promise made by the seller to the buyer which

relates to the goods and becomes a part of the basis of the bargain." The Official UCC Comment to 84-2-313 try to shed some light on what is necessary for an express warranty to be a part of the basis of the bargain.

"[N]o particular reliance on such statements [factual statements describing goods] need be shown in order to weave them into the fabric of the agreement [as an express warranty]. . . . The issue is normally one of fact.

. . . .

"[T]he basic question remains the same: What statements of the seller have in the circumstances and in objective judgment become part of the basis of the bargain?"

The 1983 Kansas Comment to K.S.A. 84-2-313 states:

"Under this section, any expression by the seller must, before it can become a warranty, become 'part of the basis of the bargain.' This is the Code's counterpart to the pre-Code requirement of reliance. The Code's test is much less stringent. The buyer need not show any specific or particular reliance. See *Young & Cooper, Inc. v. Vestring*, 241 Kan. 311, 521 P.2d 281 (1974)."

There are a few cases in Kansas which analyzed whether an express warranty applied to a particular party. In *Mays v. Ciba-Geigy Corp.*, 233 Kan. 38, 62, 661 P.2d 348 (1983), a fiberglass pipe exploded, and the plaintiff sued the manufacturer and seller of the pipe for breach of express warranty. The plaintiff alleged that it received an express warranty regarding the pipe at a training session. However, this session trained the participants to install a different type of pipe than the one which exploded. Furthermore, the training session, which supposedly provided an express warranty on the pipe, occurred at least 10 years prior to the pipe's explosion. The district court granted summary judgment to the defendant on the issue of breach of express warranty, and this court affirmed. 233 Kan. at 62-63. In so finding, this court stated:

"Under the circumstances herein, it simply cannot be said [the buyer] purchased the . . . pipe in reliance on anything said or done in the . . . training session or that same was a 'basis for the bargain.' To do so would mean the 1960's training session was some type of express warranty attaching to the use and purchase of all subsequent Ciba-Geigy pipeline products—a wholly insupportable position." 233 Kan. at 62-63.

This case is not as extreme as the *Mays* case, but it is analogous to it. Browning contends that the limitation of remedy stems from the product catalog. Olathe received the product catalog containing the remedy limitation some time prior to its receipt of the bearings in question. Olathe did not receive the catalog while it was negotiating the sale. Further, the product catalog, which included the remedy limitation, contained a different type of bearing than the bearing which malfunctioned. The remedy limitation in the product catalog did use language referring to "any" Browning product. However, it is a "wholly insupportable position" that when Olathe purchased the 1100 Series bearings it should have known that anything said in a product catalog, which was published even before the 1100 Series bearing was manufactured, would apply to its purchase of the 1100 Series bearing. See 233 Kan. at 63.

In *Voelkel v. General Motors Corp.*, 846 F. Supp 1482 (D. Kan. 1994), the plaintiff purchased a 6-year-old used car which was manufactured by the defendant. The seat belt on the car malfunctioned and the plaintiff sued the manufacturer. The plaintiff alleged that the defendant had expressly warranted the car in the owner's manual. The court granted summary judgment in the defendant's favor on the express warranty claim, finding that the language cited by the plaintiff as an express warranty was in fact a 1984 sales catalog, not the owners' manual, and that the language did not warrant the quality or performance of the seat belts. Further, the court held that even if the language in the sales catalog had created an express warranty, the plaintiff did not show that language in the sales manual was applicable to him as a part of his basis of the bargain. 846 F. Supp. 1484-85. The court stated:

"There is no evidence that he [the plaintiff] read or knew of the 1984 sales manual in May of 1990 prior to purchasing the 1984 [car] from a non-GMC used car dealer. . . .

. . . .

". . . The court can find nothing in the record from which to infer that the plaintiff purchased [the car] in reliance upon the cited language in the sales manual." 846 F. Supp. 1485.

The *Voekel* case is similar to this case. For instance, the product catalog which contained the remedy limitation was printed by

Browning and distributed to Olathe prior to Olathe's purchase of the bearings at issue. Olathe did not receive the catalog as it was negotiating the sale. Further, Olathe did not purchase the bearings from Browning; Olathe purchased the bearings from BHQ, a distributor. There is no evidence the plaintiff relied on the Browning product catalog or was aware of the remedy limitation in the catalog when ordering the product at issue. While it is clear that the plaintiff knew of the product catalog prior to purchasing the bearings, there is no evidence the plaintiff read the sales terms or knew that they would apply to the 1100 Series bearing which was not even included in the catalog. Further, the literature printed by Browning, which did contain the 1100 Series bearing, did not refer back to the catalog and its accompanying remedy limitation.

Olathe contends that the trial court correctly found as a matter of law that the remedy limitation in the Browning catalog was not binding on Olathe. Olathe points out that Browning and Olathe did not enter into a contract regarding the bearings and that the BHQ/Olathe contract, including the documents accompanying the bearings, did not refer to a remedy limitation. While previous catalogs contained remedy limitations, the only product brochure which included the 1100 Series bearing and explained its specifications did not contain a remedy limitation. Thus, according to Olathe, it was justified in believing the lack of remedy limitation in the product brochure indicated that Browning did not provide a remedy limitation with regard to the 1100 Series bearing. Moreover, the Browning representative who suggested that Olathe use the 1100 Series bearing instead of the 1000 Series bearing and helped Olathe change its bearing order with BHQ did not direct Olathe's attention to the remedy limitation found in any of Browning's prior catalogs.

We hold Olathe did not know and had no reason to know that Browning had limited the remedies available to Olathe should Browning breach a warranty in regards to the 1100 Series bearing. In order to make Olathe aware of such remedy limitation, Browning's product brochure should have at least referred to one of the prior catalogs which included a limitation of remedies, or Browning should have put a remedy limitation in the product brochure which

contained the 1100 Series bearing, or the Browning representative should have pointed out to Olathe that Browning had limited the remedies in regard to any Browning products. The remedy limitation does not apply to Olathe as a matter of law.

## Fact Question

The trial court found that the remedy limitation did not apply to Olathe as a matter of law. However, Browning contends that the evidence at trial at least created a fact issue regarding whether Browning's remedy limitation applied to Olathe. According to Browning, the jury heard ample evidence regarding Olathe's possession of Browning's remedy limitation when Olathe purchased the bearings from BHQ, and the jury should have been allowed to determine whether the limitation applied to Olathe.

In making this argument, Browning cites to *LWT, Inc. v. Childers*, 19 F.3d 539 (10th Cir. 1994). In this case, the plaintiff purchased an oil heater from the defendant. The heater malfunctioned and the plaintiff brought suit for breach of express and implied warranties against the seller/defendant. 19 F.3d at 541. The district court granted the defendant's motion for partial summary judgment, concluding that the remedy limitation in the defendant's catalog did not become a part of the basis of the parties' sales agreement. 19 F.3d at 541. The Tenth Circuit Court of Appeals reversed the district court, stating: "A limited warranty contained in a manufacturer's catalog may be considered part of the basis of the parties' bargain, so long as the purchaser received the catalog and had an opportunity to read the warranty [citations omitted] prior to or at the time of the sale." 19 F.3d at 541. Further, the Tenth Circuit stated that the "[d]efendant need not establish that [the] plaintiff had actual knowledge of the limited warranty. [Citations omitted.] The question of whether the catalog containing the limited warranty became part of the parties' bargain is ordinarily one of fact for the jury." 19 F.3d at 541.

The evidence in *LWT* indicated that the plaintiff, who was a dealer, had purchased an oil heater from defendant/manufacturer prior to purchasing the heater at issue. As a result of the previous purchase, the plaintiff possessed a copy of the defendant's catalog

which contained a remedy limitation. After referring to the defendant's catalog, the plaintiff found a suitable heater and contacted the defendant for a quote. The defendant faxed the plaintiff a quote and mailed the plaintiff an updated catalog which contained a remedy limitation. 19 F.3d at 541. Based on the quote, the plaintiff purchased the heater. The court held:

"This evidence establishes a genuinely disputed issue of fact as to whether plaintiff possessed or received defendant's catalog containing the limited warranty prior to the sale and whether that information became part of the basis of the parties' agreement. The district court, therefore, erred in determining, as a matter of law, that the catalog containing the limited warranty never became part of the parties' agreement. [Citations omitted.]" 19 F.3d at 542.

Browning contends that the fact situation here is similar to that of the *LWT* case. Browning points out that it provided Browning catalogs to BHQ, who in turn delivered the catalogs to Olathe. Thus, Olathe possessed several Browning catalogs which included a remedy limitation that applied to any Browning product. In fact, Olathe used the Browning catalogs over the years to order thousands of Browning products from BHQ. Olathe employees testified that the remedy limitation in the Browning catalog which they had in their possession was available to read if they had chosen to do so. Further, Browning points out that Olathe used a Browning catalog to order the original 1000 Series bearing for the tub grinder from BHQ. According to Browning, this evidence establishes a fact issue regarding whether Browning's remedy limitation became a part of the basis of the bargain. As such, Browning asserts that the trial court erred in refusing to allow it to present its defense or instruct the jury on the remedy limitation.

Browning's reliance on the *LWT* case is misplaced. In *LWT*, the manufacturer of the product sold the product directly to the plaintiff and directly provided the plaintiff with a catalog which contained both the remedy limitation and the oil heater at issue. Here, Browning did not sell the product directly to Olathe or directly provide Olathe with the catalog. Further, the only Browning representative who dealt directly with Olathe made no reference to the remedy limitation or the catalog containing it. Moreover, the *LWT* plaintiff ordered the product from a catalog which actually

contained the remedy limitation. Here, the only Browning product brochure which contained the 1100 Series bearing did not include the remedy limitation provision, nor did it include reference to the prior Browning catalogs and their accompanying remedy limitation provisions. The catalogs which did contain a remedy limitation did not include the 1100 Series bearing at issue. Thus, Olathe had no reason to believe that the remedy limitation found in the Browning catalogs applied to it. It is true that the remedy limitation referred to "any" Browning product. However, it is not reasonable to expect Olathe, on its own, to look to a catalog that did not contain the item ordered and apply a remedy limitation provision found in the product catalog to a product which had not even been manufactured at the time the catalog was published.

Olathe acknowledges that under *LWT* the question of whether a remedy limitation becomes a part of the parties' bargain is ordinarily one of fact for the jury. However, Olathe cites to *Shawnee Township Fire District v. Morgan*, 221 Kan. 271, 277, 559 P.2d 1141 (1977) (quoting *Hunter v. Brand*, 186 Kan. 415, 419, 350 P.2d 805 [1960]), which finds:

" 'Where no evidence is presented or the evidence is undisputed and is such that reasonable minds cannot accept it as sufficient to establish the existence of a fact, it becomes the duty of the court to remove the issue from the jury. In that event, the issue becomes a question of law for the court's determination. [Citations omitted.]' "

Olathe contends that all of the evidence regarding the remedy limitation was undisputed. Olathe then points to the trial court's statement that it was unable to find any evidence which indicated the remedy limitation was pointed out to anyone at Olathe. According to Olathe, the trial court did not intend, by this statement, that Olathe must have had actual knowledge of the remedy limitation for it to be effective. Rather, the trial court made this statement to indicate that it could not find a scintilla of evidence suggesting that the remedy limitation had become a part of Olathe's bargain. Thus, after examining the undisputed evidence, the trial court found, according to Olathe, that no evidence had been presented upon which reasonable jurors could determine the remedy limitation included in the previously printed and distributed product catalog

was related to the sale of the 1100 Series bearings or applied to Olathe. As such, Olathe argues that the trial court properly withdrew the issue from the jury and found that the remedy limitation did not apply to Olathe as a matter of law.

On the other hand, Browning contends that the evidence regarding the issue is disputed and that there is evidence in the record to support the fact that the remedy limitation became a part of the basis of the bargain. For instance, Browning conspicuously included a remedy limitation in each edition of its catalog. This remedy limitation referred to "any" Browning product. Olathe possessed the catalogs and used them to order thousands of Browning products. Many other vendors used a similar remedy limitation, and Olathe itself used a similar remedy limitation in its own product literature.

Moreover, Browning contends that Olathe's possession of the product catalog was related to Olathe's bargaining with BHQ. For instance, Olathe used the Browning product catalog, which contained the remedy limitation, to initially order the 1000 Series bearing for the tub grinder. Then, after Olathe talked to Browning's representative about the tub grinder, it merely amended its bearing order to a 1100 Series. Thus, according to Browning, Olathe's contract with BHQ originated from Olathe's initial reliance on the Browning catalog which contained the remedy limitation applying to "any" Browning product. While Olathe asserts that it did not have actual knowledge of the remedy limitation in the Browning catalog, Browning contends that there is evidence in the record to support a reasonable juror's finding that the remedy limitation objectively became a part of Olathe's bargain. Hence, Browning contends that there was ample evidence in the record to support its position that the remedy limitation was a part of Olathe's basis of the bargain when it purchased the Browning bearing from BHQ.

We disagree. All of the evidence regarding what the product catalog and the product brochure said about the remedy limitation is undisputed. The fact that Barber did not draw Olathe's attention to the remedy limitation is undisputed. Even if Olathe was constructively aware of the remedy limitation in the Browning catalog, Browning presented no evidence to indicate that the remedy lim-

itation became a part of Olathe's purchase from BHQ of this particular bearing found in the product brochure, designated as a catalog, which did not contain a remedy limitation. Thus, the trial court properly found as a matter of law that the remedy limitation did not apply to Olathe.

## Course of Dealing

Finally, Browning contends that Olathe's remedies were limited by prior course of dealing. We find no reference in the UCC which allows remedies to be limited by past conduct. The UCC only allows for past conduct or course of dealing to disclaim warranties; the UCC does not allow past conduct to limit remedies.

Browning cites to the UCC's definition of course of dealing, which is "a sequence of previous conduct between the parties to a particular transaction which is fairly regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." K.S.A. 84-1-205. According to Browning, a course of dealing existed between it and Olathe which established a common understanding that all remedies for the breach of a warranty on a Browning product were limited to repair and replacement. This course of dealing was based on the fact that Olathe possessed several Browning catalogs which contained the remedy limitation and used the catalog over the years to order thousands of Browning products from BHQ. Moreover, other dealers which Olathe dealt with used similar remedy limitations, and Olathe itself adopted similar remedy limitation language when selling its own products. Thus, Browning contends that this evidence at least created a fact question as to whether Browning and Olathe had a course of dealing which limited remedies for the breach of an express contract.

On the other hand, Olathe argues that a course of dealing between it and Browning to limit remedies did not exist. In making this argument, Olathe relies on *Bowdoin v. Showell Growers, Inc.*, 817 F.2d 1543, 1545 (11th Cir. 1987), and *Hartwig Farms v. Pacific Gamble Robinson*, 28 Wash. App. 539, 625 P.2d 171 (1981).

In *Bowdoin*, the plaintiffs used a spray rig which the plaintiffs' employer had purchased. The rig malfunctioned, and the plaintiffs sued the manufacturer and the component part manufacturer for

breach of implied warranties. Prior to the sale of the rig at issue, the employer/buyer had purchased a similar spray rig from the manufacturer. In the prior sale, the manufacturer provided the buyer with an instruction manual for the spray rig which contained a warranty disclaimer. Further, in the prior sale, the buyer acknowledged in a written form that it accepted a disclaimer of implied warranties in the sale. At the second sale, the manufacturer provided the buyer with the same instruction manual as before, containing the warranty disclaimer, but the buyer did not receive the manual until after the sale was completed. The *Bowdoin* court held that the disclaimer did not apply to the plaintiffs as it was not a part of the basis of the bargain. 817 F.2d at 1545-46. The court found that one prior dealing between the parties did not establish a course of conduct between the parties making it clear that implied warranties were disclaimed. 817 F.2d at 1547 n.18.

In *Hartwig Farms*, a seed broker cross-claimed against a seed wholesaler based on breach of implied warranty. The wholesaler had sold and delivered seed under invoice to the broker for 15 years. The invoice was typically delivered with the seed product after the sale had been made orally and confirmed in writing. The invoice contained a disclaimer of warranties. The invoice containing the disclaimer had been provided to the buyer after the sale at issue had already been closed; thus, the invoice disclaimer could not apply to disclaim the warranties on the sale at issue. However, the wholesaler argued that a course of dealing had arisen from prior transactions in which the buyer received an invoice containing a disclaimer after every sale. Thus, the buyer knew and accepted that the warranties would also be disclaimed for the sale at issue. The court disagreed. It found that there was never a negotiation or assent to the disclaimer in reference to this sale. Thus, a course of dealing as to a disclaimer had not been formed and could not be used to impute assent to the disclaimer at issue. Further, the court found the buyer's knowledge of the disclaimer was irrelevant. According to the court, the disclaimer could only have effect if the buyer and seller had actually negotiated it and agreed to it at some point. 28 Wash. App. at 544-45.

Browning contends that Olathe wrongly relies upon *Bowdoin* and *Hartwig Farms.* Browning points out that the *Bowdoin* court found a post-sale disclaimer in an instruction manual could not have been a part of the basis of the bargain. While the buyers/plaintiffs had previously received an instruction manual containing a disclaimer, the *Bowdoin* court found that until the buyers received the second instruction manual, the buyers would not know what it would contain. Further Browning points out that *Hartwig Farms* was also a post-sale disclaimer case and that the prior invoices did not apply to the present transaction because the disclaimers in those invoices were not conspicuous. In contending that *Bowdoin* and *Hartwig Farms* are inapplicable cases, Browning asserts that, unlike these cases, its remedy limitation was conspicuous and provided to Olathe prior to the purchase at issue.

Browning's remedy limitation is not directly applicable to Olathe because it was not a part of the basis of the bargain. However, Browning contends that the remedy limitation became a part of Olathe's basis of the bargain indirectly through a prior course of dealing. *Bowdoin* and *Hartwig Farms* found that the disclaimers at issue there did not become a part of the basis of the bargain indirectly through prior course of dealing because there had not been enough transactions between the parties. Moreover, there had never been a negotiation or assent to the disclaimer on any prior sale so as to impute the disclaimer to the sale in issue.

Browning and Olathe had never directly done business together. While Olathe had received the Browning catalog containing the remedy limitation several times over the years, Olathe had never negotiated or assented to a remedy limitation in any previous sale. Thus, the limitation, in prior dealings, was not so evident and clear that the disclaimers would indirectly become a part of the basis of the bargain in all latter dealings.

Further, in support of its position, Olathe cites to Kansas law. Olathe points to the previously discussed section of the UCC, K.S.A. 84-1-205(1), which defines course of dealing. According to Olathe, this statute indicates that for a prior course of dealing to impute assent to a remedy limitation in a current transaction, the dealings must consist of multiple, contractual dealings between the

same parties in which the buyer actually agrees to the remedy limitation. According to Olathe, such prior dealings did not exist here. Olathe contends that its prepurchase possession of a Browning catalog was unrelated to any prior conduct or bargaining between Olathe and Browning. In fact, Olathe points out that it has never entered into a contract with Browning, never ordered or purchased a product from Browning, and never negotiated a remedy limitation with Browning. Thus, Olathe contends that it had no prior course of dealing with Browning. Instead, Olathe purchased Browning products from BHQ in transactions where remedy limitations were never discussed. As such, the remedy limitation found in the Browning catalog should not apply to Olathe's transaction which is at issue here.

On the other hand, Browning contends that Olathe's possession of the Browning catalog was related to the current transaction in that Olathe used the catalog to order thousands of Browning products including the initial order of the 1000 Series bearing for the tub grinder. Thus, in all previous orders, Olathe should have known its order was subject to remedy limitation. Hence, Browning contends that these prior dealings should be imputed to the transaction at issue and the remedy for breach of express warranty should be limited.

Browning argues that since Olathe had previously ordered several Browning products from BHQ which were subject to the remedy limitation found in the Browning catalog, then all other Browning products which Olathe purchased from BHQ were subject to this remedy limitation even though neither the product literature advertising the product at issue nor the Browning representative recommending the product at issue mentioned the remedy limitation.

Under this position, Browning would never need to publish another remedy limitation again. According to this theory, the remedy limitation in the Browning catalog already applies to any Browning product manufactured now or in the future. This is unreasonable. The Browning remedy limitation does not apply to Olathe as a result of a prior course of dealing between the two parties.

### Third-Party Beneficiary

Browning argues that Olathe received its warranties from Browning as a third-party beneficiary of the contract between Browning and BHQ. Browning contends that as a third-party beneficiary, Olathe should not receive any greater warranty than BHQ received. Since BHQ's remedy for the breach of a warranty was limited to repair and replacement in its contract with Browning, Browning argues that Olathe's remedy for breach of express warranty should also be limited to repair and replacement.

The third-party beneficiary argument does not apply to this issue because the jury did not find that Olathe received an express warranty from Browning as a third-party beneficiary of the Browning/BHQ contract. Rather, the jury found that Olathe received its own independent express warranty from Browning. Olathe received this warranty as a result of express representations made by Browning's district manager to Olathe's engineer regarding the suitability of the 1100 Series bearing for the tub grinder and by the express representations regarding the 1100 Series bearings found in the product brochure. The question is whether the remedy limitation found in the Browning/BHQ contract and the Browning product catalog independently applied to Olathe to limit its remedies for the breach of an independent express warranty from Browning. As such, the third-party beneficiary arguments do not apply to this issue.

### II. LOST PROFITS

This case was tried twice. The first trial was declared a mistrial after 4 days of testimony. On August 18, 1993, Olathe's lost profit expert, Michael Moncrief, was deposed, and he explained Olathe's lost profit theory for the first trial. He stated that when the Browning bearings malfunctioned in Olathe's 10-foot tub grinder, Olathe had to pull this tub grinder off the market and redesign it. Olathe based its original lost profit theory on the loss of sales of this 10-foot tub grinder because it was pulled off the market and on the loss of sales of the redesigned 10-foot tub grinder due to Olathe's damaged reputation. In this deposition, Moncrief mentioned that Olathe was behind in developing a 12-foot tub grinder, but he

attributed any such delay to time spent on the lawsuit, and he made no claim of damages from this delay. Olathe's expert planned to testify at the first trial that Olathe incurred $4.3 millon in lost profits due to damaged market reputation.

Later, as the second trial approached, Olathe and its experts changed its lost profits theory from a 10-foot tub grinder/damaged reputation theory to a 12-foot tub grinder/delay theory. Olathe now contends that it had to delay its development of a 12-foot tub grinder, which it anticipated the market would demand, in order to redesign its 10-foot tub grinder so as to save its reputation. According to Olathe, this redesign effort almost entirely consumed Olathe's financial, administrative and engineering resources. However, Browning points out that at that time, 48% of Olathe was owned by Toro, which is a $700 millon Fortune 500 company. Browning questions why Toro did not supplement Olathe's resources so that Olathe could both redesign the 10-foot tub grinder and design the 12-foot tub grinder at the same time.

Olathe began marketing the redesigned 10-foot tub grinder in April 1992 and, according to Olathe, it restored its reputation by early 1993. Olathe was finally able to market its 12-foot tub grinder in 1994, over a year later than originally planned. According to Olathe, its competitors introduced their 12-foot tub grinders in late 1992 or early 1993, which coincided with a shift in customer preference for the 12-foot grinder over the 10-foot grinder, thereby allowing the 12-foot grinder to dominate the market. Due to its delay, Olathe lost its anticipated share of the 12-foot tub grinder market. Further, Olathe contends that it also lost replacement part sales which would have accompanied all the 12-foot tub grinder sales it would have made had the 12-foot tub grinder not been delayed in its production due to the redesign of the 10-foot tub grinder. Olathe calculates that, under this new theory, its lost profits for 1993, 1994, and 1995 discounted to present value would be $7,095,471 for lost tub grinder sales plus $1,002,005 for lost part sales or a total of $8,097,526 in lost profits.

This new lost profit theory was based on market research survey conducted by Olathe's lost profit expert, Moncrief. The survey projected how many 12-foot tub grinders Olathe would have sold in

1992, 1993, 1994, and 1995 had it not been for the production delay. Moncrief provided these projections to Olathe's economist expert, John Ward. Then, Ward, assuming Moncrief's survey and projections were accurate, calculated Olathe's lost profits based on this survey. Ward did not make an independent investigation into the accuracy of Moncrief's numbers. The bulk of Moncrief's survey and accompanying spreadsheet, including the sales figures for Olathe's competitors, was based on a collection of hearsay statements. For example, Moncrief talked to customers and distributors about what they had heard from competitors at trade shows, and he talked to former employees of Olathe's competitors about what their former co-workers had said regarding their employers. Thus, according to Browning, the market share percentages in Moncrief's spreadsheet were derived from the estimated sales of market participants (Olathe's competitors), which in turn were derived from various hearsay conversations.

After the mistrial, the case was reset for trial to begin June 27, 1994. A discovery conference was held January 18, 1994, in which the court set the following deadlines:

"1. The Court fixes April 15, 1994, as the date by which either party may supplement responses concerning any changes in the subject matter on which any expert is expected to testify, the substance of the facts and opinions to which any expert is expected to testify and the grounds for each opinion. The Court further adopts the parties' agreement that, if either party supplements responses concerning experts, then the opposing party may depose the expert(s) concerning the supplemental responses by May 31, 1994.

"2. The defendant may take continuing discovery concerning plaintiff's damage claims.

"3. Either party may redepose fact witnesses previously deposed but only concerning documents produced by other parties after August 16, 1993.

"4. The parties may engage in all other discovery provided that all discovery—other than the depositions of experts as provided above—must be completed by April 30, 1994. The Court further states that it discourages expensive, repetitive discovery or discovery which might reasonably have been completed before the first trial."

On the April 15, 1994, deadline, Olathe served an expert witness supplementation on Browning. This supplementation stated:

"In particular Mr. Ward [Olathe's economist expert] is expected to testify that Olathe Manufacturing suffered various types of damage due to the failure of the 1100 Series bearing, including but not limited to lost profits, redesign costs, refund and replacement costs, increased administrative and research costs, costs of financing, and potential costs associated with the remaining 866 tub grinders in use.

. . . .

". . . Mr. Ward will update his damage analysis to take into consideration changes that have occurred since his deposition: sales of 867 TGs, bank loan balances, returned 866s, 866s replaced with 867TGs [the original and redesigned 10-foot tub grinders], and sales of hammers, screens and other parts."

The supplement did not mention any 12-foot tub grinder lost profit claims.

On April 20, 1994, Browning requested that Olathe provide a supplemental interrogatory answer which specified if any previously identified experts had performed any additional work or reached any additional opinions from the date of the expert's last deposition in order to comply with K.S.A. 60-226 and the court's February 18, 1994, journal entry. In response to this request, Olathe served an expert witness supplement on Browning on April 25, 1994, which disclosed that Olathe's lost profit expert might offer testimony to support a damages claim involving not only the 10-foot tub grinder but also the 12-foot tub grinder. Further, the supplement informed Browning that Olathe's economist expert planned to recalculate his future lost profit projections based upon the new lost profit data and market estimates. Olathe did not disclose any conclusions of its economist expert as to the amount of damages Olathe had suffered due to the lost profits of the 12-foot tub grinders. On May 18, 1994, Olathe sent Browning its economist's revised damage calculations of $7,270,760 in lost tub grinder profits and $1,002,055 in lost parts profits. However, the damage report did not indicate that the economist based these figures on the lost sales of 12-foot tub grinders instead of on the lost sales of 10-foot tub grinders. This damage report merely labels Olathe's lost market share category as "Tub Grinders."

In late May 1994, Browning deposed Olathe's lost profit expert and Olathe's economist expert for the second time. At this time, the experts testified that Olathe had abandoned the damaged rep-

utation/10-foot tub grinder lost profit theory and adopted the new delay/12-foot tub grinder lost profit theory. At this deposition, Olathe's economist expert admitted that his planned testimony for the first trial—that Olathe lost $4.3 millon in lost profits due to the lost sales of 10-foot tub grinders—was 100% wrong. Further, the expert admitted that his prediction Olathe would have fewer 10-foot tub grinder sales in 1994 than Olathe had anticipated because of the faulty bearings was wrong. In fact, according to this expert, Olathe holds 35-40% of the 10-foot tub grinder market share. This is in excess of the market share which Olathe expected to hold had the bearing problems not occurred. As Olathe's lost profit expert testified, Olathe had a very successful 10-foot tub grinder.

In this May 1994 deposition, Olathe's economist expert testified that he was first told about the market's migration toward 12-foot tub grinders in January or February 1993. Further, the expert testified that "the theories kind of switched themselves. That would have been sometime about probably two months ago," *i.e.*, March 1994.

On June 21, 1994, Browning filed a motion in limine to exclude Olathe's new damage theory. The court granted Browning's motion. The court barred Olathe's lost profit expert, Moncrief, from testifying about the new lost profit theory, finding that his testimony was inadmissable hearsay under K.S.A. 60-456(b). The trial court found that Moncrief's testimony amounted to hearsay because his testimony was based upon a market survey which Olathe was not going to independently place in evidence. In its motion in limine, Browning also argued that the testimony of Olathe's experts on the new lost profit theory was untimely and unfairly prejudicial. The trial court took these arguments under advisement, stating:

"Well, in cases where prejudice is asserted because of recent amendments to pleadings or late-coming evidence or witnesses, it is generally my practice to assess the prejudice as I begin to hear the case and keep that part of it under advisement until I have a better handle on the facts and the feel for the case and then make a determination whether the prejudice is such that that evidence ought to be excluded. So I would keep the first part of the motion under advisement and take that with the evidence in the case."

After the trial concluded, the trial court affirmed its earlier ruling, which excluded the lost profit testimony as inadmissible under

K.S.A. 60-456(b). The trial court also ruled that the expert testimony proffered by Olathe was speculative and unreliable and that Olathe's disclosure of its new lost profit theory was untimely and had thereby prejudiced Browning. In making this determination, the trial court stated:

"As to the plaintiff's request for partial new trial to the 12-foot tub grinder and that damage claim, I felt very strongly at the time that the evidence supporting that claim was based on hearsay, it was quite *speculative in nature*, and I felt under Kansas law that an expert could not base his testimony on hearsay testimony in this regard, I am aware of limited exception on some market studies, but, as far as I am concerned, those are studies which have been based on scientific and procedural safeguards which were not present and shown to the court in this case. So for the reasons in that regard, I determined that plaintiff could not present the 12-foot damage claim to the jury. . . . *I do find in the alternative that the claim did come in extremely late, put the defense in an unfair position to have to rebut a substantial new claim at the eleventh hour of this case, and, based on the extensive pretrial discovery that had taken place, I felt it was unfair at the lateness of the hour to subject the defense to this additional claim.*" (Emphasis added.)

## Speculation

The admissibility of expert testimony is a matter to be determined by the trial court in the exercise of its discretion. The trial court's determination will not be overturned absent an abuse of such discretion which results in prejudice to the party whose testimony was excluded. *Marshall v. Mayflower Transit, Inc.*, 249 Kan. 620, Syl. ¶ 3, 822 P.2d 591 (1991). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court. *McKissick v. Frye*, 255 Kan. 566, 577, 876 P.2d 1371 (1994).

Olathe contends that the evidence regarding its new lost profit theory was not speculative and that the district court abused its discretion by excluding the evidence. In making this argument, Olathe points to K.S.A. 84-1-106, which allows for remedies to be liberally administered. The Official UCC Comment to this section states that the "purpose of [this] subsection . . . is to reject any doctrine that damages must be calculable with mathematical accuracy. Compensatory damages are often at best approximate: they have to be proved with whatever definiteness and accuracy the

facts permit, but not more." Olathe contends that this relaxed standard of proof also applies to the UCC sections dealing with consequential damages, K.S.A. 84-2-715. The Comments under this section provide that "loss may be determined in any manner which is reasonable under the circumstances." Relying on *Vickers v. Wichita State University*, 213 Kan. 614, 620, 518 P.2d 512 (1974), Olathe correctly points out that in determining consequential damages, a court or jury merely needs to be guided by some rational standard. This rational standard should be determined according to each individual case so that the claimant provides the best available evidence the situation allows.

*Vickers* is the key Kansas case in the area of lost profits. In *Vickers*, the plaintiff had contracted with the defendants to broadcast basketball games. In this contract, the plaintiff had a right of first refusal. However, the defendants contracted with another company to broadcast the games for a better deal without first making this offer to the plaintiff. Thus, the plaintiff sued the defendants for breach of contract because the plaintiff was not given the right of first refusal as he had contracted for. The plaintiff claimed that he suffered lost profit damages from this breach because he was not able to broadcast the games. The district court granted the defendants' motion for directed verdict. The district court found that the plaintiff had not conducted a profitable business for a long enough period of time under the contract to ascertain with reasonable certainty the plaintiff's loss of future profits. This court reversed the district court, stating:

"The evidence necessary in establishing lost future profits with reasonable certainty 'must depend in a large measure upon the circumstances of the particular case . . .' (Requirements of Certainty of Proof of Lost Profits, 64 Harv. L. Rev. 317, 319.) Absolute certainty in proving loss of future profits is not required. (22 Am. Jur. 2d, Damages, § 172.) What is required is that the court or jury be guided by some rational standard. (*Brenneman v. Auto-Teria, Inc.*, 260 Or. 513, 491 P.2d 992; *Smith Development Corp. v. Bilow Enterprises, Inc.*, 112 R.I. 203, 308 A.2d 477; *Mechanical Wholesale, Inc. v. Universal-Rundle Corp.*, 432 F.2d 228 [5th Cir. 1970].) As to evidentiary matters a court should approach each case in an individual and pragmatic manner, and require the claimant furnish the best available proof as to the amount of loss that the particular situation admits. (McCormick, Law of Damages, § 29 [1935].) It is the responsibility of a district court to

see that speculative and problematical evidence does not reach the jury. 213 Kan. at 620. See *Cricket Alley Corp. v. Data Terminal Systems, Inc.*, 240 Kan. 661, 669, 732 P.2d 719 (1987); *Stair v. Gaylord*, 232 Kan. 765, 773-74, 659 P.2d 178 (1983); Official UCC Comment, K.S.A. 84-1-106.

Besides relying on *Vickers*, 213 Kan. at 620, Olathe also points to several cases which hold that when a contract with a new venture is breached, the plaintiff should be allowed to prove lost profits even though the evidence is not certain because the new venture has no historical data to rely upon. See *Butler v. Westgate State Bank*, 226 Kan. 581, 582-83, 602 P.2d 1276 (1979); *Kvassay v. Murray*, 15 Kan. App. 2d 426, 433-35, 808 P.2d 896, *rev. denied* 248 Kan. 996 (1991); see also Official UCC Comment, K.S.A. 84-2-708 ("It is not necessary to a recovery of [lost profits] to show a history of earnings especially if a new venture is involved.").

However, the facts and outcome of *Butler* are more supportive of Browning's position that the evidence of the new lost profits theory was properly excluded as speculative than they are of Olathe's position. In *Butler*, the plaintiff contracted with a bank for a loan so the plaintiff could buy a Kansas City area franchise of a telephone directory business. The bank did not make the loan, and the plaintiff sued for breach of contract. The jury awarded the plaintiff $40,000 in lost profits, but the district court set aside the award because the evidence of lost profits was speculative. This court affirmed. 226 Kan. at 585.

The only evidence which the plaintiff presented to prove lost profits was the testimony of the person who was selling the franchise. The court noted that the seller of the franchise had never managed or supervised the sales of telephone directories in the Kansas City area. The seller did not testify as to the profits, sales, accounts receivable, or debts of the business while it was under the seller's operation. Instead, the seller compared the Kansas City area market to two markets he believed were similar to it in Texas. In making this comparison, the seller stated that the Texas market was a little bigger than the Kansas City market and that he was not certain of the exact number of directories the company published in the Texas area. He testified that his estimate could be off by 15,000 to 20,000 directories. Further, the seller did not know if

the two areas were similar in the number of residential areas as compared to business or industrial areas. Moreover, the seller had forgotten the comparison between income ratio per household in each market. Based on this evidence, this court found that the plaintiff's lost profits could not be established with reasonable certainty. 226 Kan. at 584. This is similar to the case at hand.

When Browning questioned Moncrief, Olathe's lost profit expert, about the numbers on his spreadsheet, Moncrief admitted that he did not remember where he had obtained some of the sales figures. Moreover, for at least one company listed, Moncrief did not know if the sales figures were solely attributable to tub grinders or if the sales figures also encompassed other products sold by the company. Further, Moncrief testified that he obtained some of the numbers for the spreadsheet from customers who had talked to salespeople, or from distributors who had talked to customers, or from former employees of competitors. Several of the spreadsheet numbers are derived from Moncrief's assumptions and guesses. Just as in *Butler*, much of the testimony supporting Olathe's lost profits under the new theory was based on a mere guess rather than supported by facts. As such, the district court properly excluded the evidence as speculative.

However, Olathe contends that certainty is only required when a party is attempting to prove that it actually suffered damages. According to Olathe, once a party has proven with certainty that it suffered damages, such certainty is not required when the party is attempting to prove the amount of damages. Olathe contends that the amount of damages only needs to be proven by a just and reasonable inference which includes a reasonable basis of computation. According to Olathe, it is sufficient to prove the amount of damages by the best evidence obtainable under the circumstances which allows the jury to arrive at an approximate estimate of the loss.

Olathe contends that the fact it suffered consequential damages is proven with certainty. For instance, there is no question, according to Olathe, that it was required to pour all of its resources into the redesign of the 10-foot tub grinder and that Olathe would have used these resources to develop a 12-foot tub grinder had the

bearings in the 10-foot grinder not been faulty. Olathe contends that the excluded evidence merely quantified the certain fact of consequential damages into terms of market share and profit losses. These terms were based upon the best objective evidence available in the small, dynamic tub grinder industry.

Olathe bases this argument on K.S.A. 84-2-715 and *New Dimensions Products, Inc. v. Flambeau Corp.*, 17 Kan. App. 2d 852, 859, 844 P.2d 768 (1993) (stating that the amount of consequential damages does not need to be foreseeable in order to recover such amount, only the fact of such loss must be foreseeable in order to recover). Browning properly cites the holding of *New Dimensions*. However, the factual background of *New Dimensions* indicates that it is distinguishable from this case.

In *New Dimensions*, the plaintiffs had a licensing agreement with the defendant, who was to sell the plaintiffs' recipe organizer. The plaintiffs contend that the defendant breached the contract by, *inter alia*, failing to pay royalties on the sale of the organizers. The trial court awarded the plaintiffs $35,297.23 in damages. The defendant appealed. The defendant admitted that it breached the contract and that it did not pay the plaintiffs all the royalties which it owed the plaintiffs. However, the defendant contended that the evidence offered to establish damages and the method used by trial court to compute the damages was speculative and unreliable. The Court of Appeals affirmed the trial court's award of damages, stating:

"The record very clearly indicates that it was appellant who had exclusive control over all the records concerning production, sales, and costs of materials. Appellant consistently denied those records existed at the trial and steadfastly refused to produce them. Under these circumstances, proof of damages was difficult. This difficulty was created by appellant, and appellee should not be penalized by appellant's failure to either keep the necessary records or to produce them when asked to do so. The only method offered to determine the amount of unpaid royalties in this case was put forward by appellee. The trial court concluded:

" 'The analysis, of comparing the reduction of inventory with the reported sales during the only time frame in which the inventory is known, to create a ratio of unreported to reported sales, and applying the same ratio to other time frames provides a reasonable basis for awarding damages under the circumstances.'

"We agree with the trial court's comments set forth above. We conclude the evidence offered by the appellee was the best evidence obtainable under the circumstances." 17 Kan. App. 2d at 859.

Thus, in *New Dimensions*, the court was very liberal in the type of evidence and inferences it allowed the plaintiffs to use when proving lost profits because the defendant controlled most of the documentation needed to prove lost profits. This is not the case here. The record does not indicate that Browning had access to any evidence which would help to prove Olathe's lost profits or that Browning tried to keep Olathe from discovering any evidence which would prove Olathe suffered lost profits.

According to Olathe, its lost profit evidence would have presented the jury with a reasonable basis of computation to arrive at an approximate loss. Accordingly, Olathe contends that such evidence presented a valid question of fact which should have been submitted to the jury. Thus, Olathe contends the trial court abused its discretion by excluding its evidence on the new lost profit theory.

Browning, on the other hand, asserts that Olathe's lost profit expert, Moncrief, planned to testify to figures which were speculative, were lacking in foundation, and were an improper basis for expert opinion. Browning points to the Kansas rule that expert testimony must be based on reasonably accurate data and not simply based on an unsupported assumption, theoretical speculation, or conclusory allegations. *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 663 F. Supp. 1360, 1479 (D. Kan. 1987), *aff'd in part, remanded in part* 899 F.2d 951 (10th Cir.), *cert denied* 497 U.S. 1005 (1990).

Browning also relies on the *Vickers* case. Browning points out that *Vickers* gives district courts "the responsibility . . . to see that speculative and problematical evidence does not reach the jury." 213 Kan. at 620. The district court must carry out this responsibility by approaching each case in an individual and pragmatic manner and requiring the claimant to provide the best proof available under the circumstances. 213 Kan. at 620. Browning contends that the district court approached this case in an individual and pragmatic manner by allowing Olathe to present its 10-foot

tub grinder lost profit theory to the jury but not allowing Olathe to present its 12-foot tub grinder lost profit theory.

Olathe's evidence regarding the new lost profit theory was based on rumors, guesses, and assumptions. Thus, the trial court did not abuse its discretion in holding that the lost profit evidence was speculative as a matter of law.

## NOT TIMELY DISCLOSED

The trial court is vested with broad discretion in supervising the course and scope of discovery. In addition, the trial court has discretion on the admission or exclusion of evidence, and that decision will not be disturbed on appeal absent a showing of abuse of discretion. *Ryan v. Kansas Power & Light Co.*, 249 Kan. 1, 11, 815 P.2d 528 (1991). A trial court abuses its discretion only when no reasonable person would agree with the trial court's position. *Vickers v. City of Kansas City*, 216 Kan. 84, Syl. ¶ 5, 531 P.2d 113 (1975). Both parties agree that abuse of discretion is the appropriate standard of review.

Olathe contends, however, that the trial court's discretion in excluding expert testimony based on late disclosure is not unfettered. According to Olathe, the trial court may only exclude evidence based on late disclosure if the party requesting exclusion was prejudiced by the late disclosure and the prejudice could not have been prevented by a less harsh remedy than the exclusion of evidence. Olathe contends that the trial court should have decided between exclusion or a less harsh remedy by seeking an explanation of the late disclosure, weighing the importance of the testimony which was disclosed late, and determining how much time the party requesting exclusion would need to defend the testimony. See *West v. Martin*, 11 Kan. App. 2d 55, 58, 713 P.2d 957, *rev. denied* 239 Kan. 695 (1986) (In finding that the trial court abused its discretion by limiting the testimony of an expert who had not been identified as such, this court stated that "[t]he trial court had effective options available other than excluding the expert testimony. Those options ranged from imposing sanctions on plaintiff's attorney to allowing the defendant to interview or depose [the witness] prior to his

being called."); 8 Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d § 2050, p. 610 (1994).

Based on this standard, Olathe contends that the trial court abused its discretion. Olathe contends that Browning was aware of its new damage theory on April 25, 1994, two months before trial, when Olathe filed its second expert witness supplementation. Further, Olathe points out that on May 18, 1994, 1 month before trial, Ward, Olathe's economist expert, issued his revised damage calculations which included figures based on Moncrief's new lost profit theory. On May 23, 1994, 3 weeks before trial, Browning deposed Moncrief for the second time, and he fully explained the new lost profit theory based on the delay in the production of the 12-foot tub grinder. Olathe asserts that it did not disclose the revised expert opinions on this new lost profit theory at such a late date in order to mislead Browning. Rather, it contends that the 10- and 12-foot tub grinder markets evolved while the case was pending; thus, Olathe's market projections and lost profit figures also evolved while the case was pending.

Olathe contends that if Browning suffered any prejudice as a result of Olathe's late disclosure, then Browning should have requested a continuance. Olathe points out that neither Browning nor the trial court suggested this measure as an alterative to the exclusion of the lost profit evidence. Olathe contends that it was Browning's responsibility to request a continuance if it thought it needed one to prevent prejudice. Olathe did not have any reason to request a continuance before trial because the only reason which the trial court gave before trial for excluding the lost profits evidence was that the evidence amounted to hearsay under 60-456(b). Olathe did not request a continuance at this time because a continuance would not have cured this hearsay problem. The trial court did not make a finding that prejudice had occurred due to the late disclosure until after the trial had concluded. At this time, it was too late for Olathe to cure the problem by requesting a continuance. Olathe contends that the trial court's post-trial finding of pretrial prejudice arising from the late disclosure of Olathe's lost profit theory resulted in prejudice to Olathe's ability to seek com-

pensation for its damages because the trial court made the finding after it was too late for Olathe to fix the problem.

In response to Olathe's post-trial argument, Browning points out that it argued in a motion in limine before the trial began that the evidence was untimely disclosed and prejudicial. On June 24, 1994, Browning and Olathe argued the motion before the trial court. However, Olathe never requested a continuance at this time to cure any prejudice which the trial court might have found to exist. Browning contends that it is absurd for Olathe to argue that Browning should have suggested a continuance to prevent prejudice when Olathe caused the prejudice by its own delay and failed to request a continuance itself.

As Browning points out, Olathe had a duty to supplement discovery responses under K.S.A. 60-226. Furthermore, the trial court specifically ordered April 15, 1994, as the deadline to supplement experts' reports with any new information the experts were expected to testify about, and the trial court ordered April 30, 1994, as the deadline for fact discovery. According to Browning, Olathe switched to its new damage theory in March 1994. Browning contends that, rather than abiding by these requests and deadlines as Olathe would have been able to do, on April 15, 1994, Olathe served its expert witness supplementation on Browning with no mention of the new lost profit theory. Further, Browning points out that the updated damage figure, which it received from Olathe on May 18, 1994, did not clarify that the lost profit damages were based on lost sales of the 12-foot tub grinder instead of the 10-foot grinder. Browning asserts that Olathe did not explicitly make known its new damage theory until Browning deposed Moncrief and Ward for the second time in May, 3 weeks after the close of fact discovery and only 1 month before trial.

Olathe cites to *Hurlbut v. Conoco Inc.*, 253 Kan. 515, 532-33, 856 P.2d 1313 (1993), as supportive of its position that the court did not need to exclude the expert's testimony. In *Hurlbut*, the plaintiff delivered additional expert reports and calculations to the defendant approximately 6 days before the trial. The defendant requested that the calculations be excluded or that the trial be continued so that it would have time to prepare a defense. The

trial court denied both requests. The court denied such requests because the court calendar and budget had been set for over a year to accommodate the trial at that time. Further, the trial court found that the plaintiff did not attempt to hide the information from the defendant. Rather, the plaintiff forwarded the information directly to the defendant upon becoming aware of it. Further, the court found that the new calculations did not alter the ultimate opinions of the plaintiff's expert and that some of the expert's new calculations were the result of new information received from the defendant's experts.

While Olathe cites *Hurlbut* as authority for its position, *Hurlbut* is distinguishable from this case. Instead, it supports Browning's position that the trial court's exclusion of the evidence was proper. For instance, in this case, unlike *Hurlbut*, there was some testimony proffered that Olathe may have been aware of this new lost profits theory for several months before it decided to disclose the theory to Browning. Second, unlike *Hurlbut*, Olathe's new lost profit theory did alter its experts' ultimate opinions as to the amount of lost profits which Olathe suffered and as to what product experienced the lost sales. Moreover, unlike *Hurlbut*, this new lost profit theory was not premised on any new information provided by a Browning expert; thus, Browning was totally surprised by the theory and was not prepared to defend against it.

Further, *Hurlbut* also affirmed the trial court's allowance of a 4-day continuance, rather than an exclusion, to allow the defendant time to prepare a defense against the new evidence which was discovered 3 weeks into the trial. While this seems to support Olathe's position, the *Hurlbut* court promulgated the following rule to determine when a trial court should exclude evidence:

"Under K.S.A. 60-455, the trial judge may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered." 253 Kan. at 534.

Apparently the trial judge here found that the probative value of the new lost profit theory did not outweigh the risk that its admission would unfairly and harmfully surprise Browning, which

had not had a reasonable opportunity to anticipate such evidence would be offered. It cannot be said that no reasonable person would agree with the trial court's determination; thus, the trial court did not abuse its discretion by excluding the evidence even if it did so after the trial.

Finally, Browning attempts to show how it was prejudiced by Olathe's late disclosure of the new lost profit theory. According to Browning, it was prepared to defend against a lost profit claim based on Olathe's lost reputation. However, Browning asserts that it was not prepared to defend against a new theory which alleged $8.3 millon in lost profits due to the delay in the marketing of a new and different tub grinder. Based on Olathe's late disclosure of its new lost profit theory, Browning did not have the opportunity to discover the following information: Whether Olathe's delay in marketing the 12-foot tub grinder resulted from design problems in the grinder instead of a bearing problem in the 10-foot tub grinder; whether Olathe misread the market; or why Toro, a $700 millon company which owned 48% of Olathe at the time, did not provide the resources Olathe allegedly needed so that Olathe could redesign the 10-foot tub grinder and simultaneously design and market the 12-foot tub grinder. Thus, Browning contends that the trial court had discretion to exclude evidence regarding Olathe's new 11th hour lost profit theory. In making this argument, Browning relies on *Barnes v. St. Francis Hospital & School of Nursing*, 211 Kan. 315, 507 P.2d 288 (1973); and *Curry v. Klein*, 251 Kan. 670, 840 P.2d 443 (1992).

In *Barnes*, the plaintiff deposed the defendant's expert and asked the expert the basis upon which he formed his opinions. The expert responded that he had formed his opinions on hospital admission reports, nurses' reports, nurses' notes, photographs, and charts. At trial, the expert testified that he had also based his opinions on some microscopic slides which he had examined. The plaintiff objected, and the district court excluded the expert's testimony concerning the slides, finding that the expert did not seasonably disclose this information. This court found that the trial court did not abuse its discretion in excluding the testimony. 211 Kan. at 320-21.

In *Curry*, the defense counsel advised the plaintiff's counsel 4 days before trial that a doctor, who had been struck from the case by a different district judge 10 months earlier, would be called as an expert witness at trial. The plaintiff objected, claiming prejudice and surprise. The trial court excluded the expert's testimony on the basis of surprise and prejudice, and this court found that this ruling was not an abuse of discretion. 251 Kan. at 675.

Finally, Browning points to *Ryan v. Kansas Power & Light Co.*, 249 Kan. at 11-12, which holds that the purpose of discovery is to eliminate the element of surprise from trials and to simplify issues by fully disclosing the evidence regarding the issues. According to Browning, Olathe's late disclosure of its new lost profits theory and the evidence regarding this theory was opposed to the purpose of discovery and thus was properly excluded. We agree. The trial court did not abuse its discretion by justifying the exclusion of the evidence as unfairly prejudicial after the trial had terminated.

For the two reasons set forth above, the testimony and evidence regarding Olathe's new lost profits theory were properly excluded. Thus, we do not need to reach the hearsay issue or determine whether the lost profits were foreseeable by the defendant (the reason for exclusion argued by Browning in its motion in limine but not addressed by the trial court).

The trial court is affirmed.