In re M.A.S. REALTY
CORPORATION,
Debtor.

No. 02–46121.

United States Bankruptcy Court,
D. Massachusetts.

Dec. 20, 2004.

Steven Weiss, Edward Sabella, Shatz, Schwartz & Fentin, P.C., Springfield, MA, for M.A.S. Realty Corp.

Louis Robin, Fitzgerald, O'Brien, Robin & Shapiro, Longmeadow, MA, Melvin Hoffman, Looney & Grossman, Boston, MA, for North Shore Renewal, Inc.

### MEMORANDUM OF DECISION

JOEL B. ROSENTHAL, Bankruptcy Judge.

This dispute arises out of the Debtor's Objection to Claim of North Shore Renew-

al, Inc. [Docket # 208] and North Shore Renewal, Inc.'s Request for Payment of Administrative Claims (at least in part) and Determination of Balance of Claim [Docket # 213]. The Court held an evidentiary hearing on August 30, 2004 and took these matters under advisement. The parties were given additional time to submit memoranda of law. Based on the record before the Court, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 7052.

## FACTS

North Shore Renewal, Inc. (hereinafter "N.S.R.I.") filed an administrative expense claim, seeking, in part, return of a $100,000 deposit under a prepetition Purchase and Sale Agreement (hereinafter "P & S") executed between N.S.R.I. and M.A.S. Realty Corporation (hereinafter "M.A.S." or "Debtor"). The subject of the P & S was a parcel of real property located in Fitchburg, Massachusetts ("the Nockege Mill Property"). In accordance with the terms of the P & S, N.S.R.I. deposited $100,000 into escrow (the "Deposit"). N.S.R.I. could then extend the closing date in 30–day increments, up to a total of eight times, by giving written notice to the Debtor of its intent to do so. Upon each such extension, the purchase price would be increased by $50,000 and the Debtor would be entitled to withdraw and use for its own purposes, free of restrictions, $10,000 from the escrowed funds. N.S.R.I. exercised its right to all eight extensions pursuant to the P & S and the First Amendment thereto (entered into on May 8, 2003), thereby reducing the escrowed funds to $20,000. *Agreed Exhibits, Exhibit 7.* The First Amendment provided that if all extension options were exercised, the closing would take place on September 30, 2003, with the remaining $20,000 of the Deposit to be credited to the purchase price.

On September 30, 2003, N.S.R.I., through its attorney Sarah Ruth Evans, Esq., wrote a letter to M.A.S.' attorney, Steven Weiss, seeking to extend the closing date to December 31, 2003 at 12:00 p.m., "time being of the essence." *Letter of Sarah Ruth Evans, Agreed Exhibits. Exhibit 9.* M.A.S. responded to this letter on October 3, 2003 and agreed to extend the closing date as requested. The letter also contained the following language: "in particular, this letter will confirm that, as consideration for further extensions of the Purchase Agreement, our client may utilize $10,000 of the deposit each month as payment for the extension option, with such amounts being credited to the purchase price at closing..." *Letter of Steven Weiss, Agreed Exhibits, Exhibit 10.* The October 3, 2003 letter also stated, allegedly for the first time, that M.A.S. was in Chapter 11 proceedings. *Letter of Steven Wilchins, Agreed Exhibits, Exhibit 11.* In the ensuing correspondence N.S.R.I. did not object to the terms of the Debtor's October 3 letter, but stated that "if the Bankruptcy Court does not approve this transaction or the transaction is negatively affected in any other way by the Chapter 11 proceeding, Nockege will employ all legal means at its disposal to protect its rights and recover its damages." *Id.*

Following an evidentiary hearing, the Court ruled that N.S.R.I. introduced "no credible evidence in this record to demonstrate to me that M.A.S. Realty Corporation [sic.][1] owns any portion of the claim... to permit them to make the claim for anything beyond the deposit." *Transcript of Evidentiary Hearings, p. 194,*

---

**1.** The reference to M.A.S. Realty Corporation was erroneous; the party intended to be referenced was N.S.R.I.

*lines 8–12.* The Court further ordered N.S.R.I. to submit a Memorandum of Law with respect to its entitlement to the Deposit, and gave the Debtor time to submit its response. *Id.*

## ISSUES PRESENTED

1) Was N.S.R.I., as a party to an executory contract, a creditor of M.A.S. and thus entitled notice of the bankruptcy filing?

2) If N.S.R.I. is deemed a creditor that should have been given notice of the Chapter 11 proceeding, did the Debtor's failure to so harm N.S.R.I.?

3) Is N.S.R.I. entitled to a refund of its $100,000 Deposit or any portion thereof?

## DISCUSSION

### 1) **Is a party to a prepetition executory contract a creditor?**

■ The right to be included in the Debtor's creditor matrix (and listed in the Debtor's schedules[2]) hinges on N.S.R.I.'s status vis-a-vis the Debtor. Generally, "the matrix functions as a mailing list by which the Court is able to notify *creditors* of the filing of a case in which they have an interest and of their rights in the case." *In re Pettey,* 288 B.R. 14, 19 (Bankr. D.Mass.2003) (*emphasis added*). As such, the Debtor would have been required to list N.S.R.I. on the mailing matrix if N.S.R.I. was a creditor of the Debtor.

A creditor includes "an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A). A claim is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," or a "right

to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." 11 U.S.C. § 101(5)(A) and (B). The Bankruptcy Code (hereinafter "Code") definitions differ markedly from those contained in the former Bankruptcy Act which construed creditors much less broadly and did not define claims. Under the Act a creditor included any party that owned a "debt, demand or claim *provable* in bankruptcy." *Former Bankruptcy Act* § 1(11). (*emphasis added*).

■ The changes brought about by the Code triggered a distinction of critical importance. Section 101(10) of the Code deleted the words "debt," "demand," and "provable" and specifies that a creditor is any entity with a "claim" against the debtor. As a result, in marked contrast to preexisting law, the Code makes clear that a creditor is no longer required to have a "fixed" claim. *Collier on Bankruptcy* ¶ 101.10 (15th ed. Rev.2003). Furthermore, Section 101(5) expressly included within the purview of claim a cause of action or right to payment that has not yet accrued or become cognizable. *In re Cool Fuel, Inc.,* 210 F.3d 999 (9th Cir.2000). Under the Code, neither the contingency of the debt nor the immaturity of the obligation affects whether a right to payment could properly be considered a claim. *In re Manville Forest Products,* 209 F.3d 125 (2d Cir.2000). Thus a non-debtor party to an executory contract does not need to wait until the contract is rejected or otherwise breached in order to have a

---

**2.** All executory contracts in which the Debtor is involved as of the petition date are required

to be included in Schedule G.

claim within the broad meaning of the Code.

■ Upon consideration of the foregoing, this Court concludes that the Code's express shift from provability to a broader definition of claim, a shift which encompassed within its ambit unliquidated, contingent and unmatured rights to payment, renders non-debtor parties to executory contracts creditors of the Debtor. The Debtor has not advanced any cogent arguments to the contrary and the Court does not know of any authority that would suggest otherwise. As such, the Court sees no reason to adopt a contrary position. In fact, the nature of the relationship between parties to prepetition executory contracts appears to the Court to be an example of precisely the type of claim the Code sought to include in a Debtor's bankruptcy.

■ The Court thus concludes that N.S.R.I., a party to a prepetition executory contract with M.A.S., was entitled to notice of the Debtor's Chapter 11 proceeding. It is true that a provable claim may never have materialized, but the existence of a contingent claim that would ripen upon the breach of the P & S is sufficient to make N.S.R.I. a creditor. N.S.R.I. had a claim, albeit an unliquidated, contingent or unmatured claim, against the Debtor. The conclusion that N.S.R.I. was a creditor is thus inescapable, a reality which imposed a duty on M.A.S. to include N.S.R.I. in its matrix of creditors.

### 2) Was N.S.R.I. harmed by the Debtor's failure to schedule it as a creditor?

■ Having concluded that N.S.R.I. was a creditor that M.A.S. should have scheduled, the Court now turns to the question of whether, and if so, in what amount, N.S.R.I. was harmed by the Debtor's failure to include it in its creditor matrix.

N.S.R.I argues that it would have proceeded differently vis-a-vis the sale if it had received timely notice of the Debtor's Chapter 11 proceeding, alleging that it was unable to meet its financing contingencies under the P & S due to the bankruptcy. *Objection to Motion for Order Approving Private Sale and Notice of Intended Sale and Request for Voiding of Agreements, Return of Deposit and Compensation for Other Injuries, Agreed Exhibits, Exhibit 13.* In its Memorandum of Law, N.S.R.I. specifically asserts that "but for the Debtor's conduct, [it] would have terminated the P & S Agreement on January 30, 2003, recovering its $100,000 deposit and avoiding considerable expense." *Memorandum of Law in Support In Support of Administrative Expense Claim and Request for Payment of North Shore Renewal, Inc.* [Docket # 307]. Yet N.S.R.I. produced no evidence to support this allegation. In its Objection to the Motion to Sell, N.S.R.I. stated that the Debtor's involvement in Chapter 11 proceedings was the reason it was unable to obtain financing, yet it appeared to have abandoned this argument at the evidentiary hearing. The Court finds that N.S.R.I.'s inconsistent and at times conflicting testimony renders not credible its contention that it would have terminated the P & S Agreement on January 30, 2003 and recovered its Deposit if it had known of the Chapter 11.

The Court heard testimony from Stephen Yellin, the husband of N.S.R.I. President Elaine Yellin, and Gennaro Perotta, Operations Manager of Algen Construction and Development, which worked with N.S.R.I. to put together financing for the Nockege Mill Property. Both provided testimony, stating they believed that consummation of the deal was still viable following the news of the bankruptcy. For instance, when asked if he was "still trying to make the deal happen even after finding out

about the Chapter 11 proceeding," Mr. Yellin responded by stating "Absolutely." *See Transcript of Evidentiary Hearings, p. 83, lines 7–9.* When asked, "so there was no documents that supported that NSRI couldn't get financing, that's correct?," Mr. Yellin responded by stating "I think that is a fair statement" and then admitted to having "no personal knowledge to the contrary." *Id. at p. 86, lines 15–22.*

Gennaro Perotta provided testimony that after October 3, 2003, when he became aware of the bankruptcy, he was still "interested" in "making this deal work." *Id. at p. 177, lines 12–21.* Asked if "financing [was] available to this project while MAS was in Chapter 11," Mr. Perotta replied simply, "Yes, sir." *Id. at p. 178, lines 23–25.* Although N.S.R.I. argues it would have terminated the P & S had it learned of the Debtor's bankruptcy in a timely fashion, the Court is of the opinion that this is simply not true. The lack of timely knowledge of the bankruptcy is not what kept N.S.R.I. in the deal; the fact that it believed the deal was economically feasible, and perhaps beneficial, was N.S.R.I.'s motivation.

Further evidence undercutting N.S.R.I.'s assertion can be found in Stephen Wilchins' letter of October 3, 2003, written after being informed that the Debtor was in Chapter 11 proceedings. The letter stated that it would seek legal action against the Debtor "if the Bankruptcy Court does not approve this transaction or the transaction is negatively affected in any other way by the Chapter 11 proceeding." *See Letter of Steven Wilchins, Agreed Exhibits, Exhibit 11.* This language manifested a clear intent to proceed with the transaction and consummate it on December 31, 2003 despite the knowledge that M.A.S. was involved in Chapter 11 proceedings. As such, the Court is unable to accept N.S.R.I.'s unsupported argument that it would have immediately withdrawn from the proposed sale and reclaimed its Deposit had it learned of the bankruptcy in January, 2003 in light of its expressed desire to go forward and continued belief in the deal's profitability even after learning of it over eight months later when the purchase price had risen by $400,000. Furthermore, the Bankruptcy Court approved the sale over N.S.R.I.'s objection. N.S.R.I. proffered no evidence that the Chapter 11 proceeding affected the transaction in any way. Therefore, N.S.R.I.'s inconsistent testimony, conflicting statements and the conduct in which it engaged after learning of the bankruptcy undermine the credibility of its principal argument. The Court finds that the Debtor's failure to schedule N.S.R.I. as a creditor resulted in no harm and N.S.R.I.'s conflicting statements regarding its desire and ability to proceed with the transaction, coupled with the Court's subsequent approval thereof, render the Debtor's violation of its duty to schedule the creditor non-compensable under these factual circumstances, as the breach of duty was not the cause of the alleged harm.

### 3) The Deposit

N.S.R.I. contends that even if the Court rejects its other arguments, it is entitled to recover $20,000 of its Deposit. Specifically, it argues that neither the P & S nor the First Amendment thereto authorized the Debtor to make further draws against the Deposit in an amount aggregating more than $80,000. Further, it asserts that the terms of the P & S "set forth the entire agreement between the parties...and may be canceled, modified, or amended only by a written instrument signed by both Seller and Buyer" and that it did not sign the Debtor's letter of October 3, 2003. According to N.S.R.I., the written communications of September 30, 2003 and October

3, 2003 did not alter the rights of the parties. The P & S and First Amendment specifically authorized a total of only eight extensions, and the September 30, 2003 letter extending the closing date from September 30, 2003 to December 31, 2003 represented a single extension requiring no consideration. N.S.R.I. thus argues that it is entitled it to the remaining $20,000 of the escrowed funds.

The Debtor counters by arguing that N.S.R.I.'s September 30, 2003 letter constituted an agreement for further draws against the Deposit as consideration for the additional extensions in accordance with the parties' prior course of dealings. The Debtor also maintains that N.S.R.I.'s failure to sign M.A.S.'s October 3, 2003 letter is of no consequence because both parties agree that the September 30, 2003 letter served to extend the closing date even though it was signed by N.S.R.I.'s attorney, Sarah Ruth Evans, rather than by N.S.R.I. itself. Finally, M.A.S. claims that it clearly delineated in its October 3, 2003 letter the terms of the extension, yet N.S.R.I. did not object. N.S.R.I.'s failure to object, the Debtor argues, therefore served as an implied acceptance of the terms of the October 3, 2003 letter and a desire to consummate the deal on December 31, 2003 despite its actual knowledge of the Debtor's Chapter 11 proceeding. According to the Debtor, the extension from September 30, 2003 to December 31, 2003 actually represented three separate one-month extensions, with $10,000 to be withdrawn from the escrowed funds for each month the date was extended. Accordingly, M.A.S. argues that N.S.R.I. is entitled to a refund of no portion of its Deposit because the extensions effectively served to deplete it.

■ The Court must resolve whether N.S.R.I.'s letter of September 30, 2003, the Debtor's response of October 3, 2003 and N.S.R.I.'s response thereto altered the rights and obligations outlined in the P & S Agreement and First Amendment, both of which specifically limited the number of extensions. To alter the rights and obligations, a new document would have had to be executed containing the signatures of both M.A.S. and N.S.R.I. or their respective attorneys.[3] The letter of Attorney Weiss of October 3, 2003 thus would have served this purpose if both parties or their attorneys acting in a representative capacity had signed it. The October 3, 2003 letter, however, did not contain the signature of N.S.R.I. or its attorney. Therefore, the Debtor's October 3, 2003 letter had no independent legal significance. Further, the Court finds that N.S.R.I.'s response to the Debtor's letter of October 3, 2003 merely evidenced an intent on the part of N.S.R.I. to go forward with the deal, albeit with a threat of legal action should the Bankruptcy Court decline to approve it.

As both parties agree that the closing date was extended from September 30, 2003 to December 31, 2003 yet disagree as to the terms to be applied, it is incumbent upon this Court to resolve the ambiguity. First, even if the Court adopts the position advanced by N.S.R.I., that the extension of three months constituted one extension rather than three separate one-month extensions, the Court finds that, based upon the parties' course of dealing, N.S.R.I. was obligated to give consideration for this op-

---

**3.** The Court notes that, while Paragraph 25 of the P & S technically requires the signatures of both Buyer and Seller to alter the rights and obligations set forth therein, the fact that both parties agree that the letter of September 30, 2003 (which contained only the signatures of counsel) served to extend the closing date to December 31, 2003 evidences the intention that the signatures of the respective attorneys would serve the same purpose.

tion. It is simply unrealistic to accept that M.A.S. would be willing to grant a three month-extension absent some form of consideration. N.S.R.I. was obligated to pay something for the option to close on December 31, 2003. The question is how much.

 Where critical terms of an agreement are silent or ambiguous, Courts may look to the parties' course of dealing. *Olathe Mfg., Inc. v. Browning Mfg.*, 259 Kan. 735, 915 P.2d 86 (1996). A single transaction is insufficient to constitute a course of dealing; rather, a course of dealing requires a sequence of previous conduct between parties to a particular transaction that is fairly regarded as establishing a common basis of understanding or interpreting their expressions and other conduct. *Id.*

The parties engaged in many extensions of the closing date, each valued at $10,000 per thirty days. Thus, although the letter of October 3, 2003 did not alter the rights and obligations of the P & S, the Court finds that the parties' course of dealing over the preceding months weighs in favor of the conclusion that each 30–day extension of the closing date was worth $10,000. Debtor's counsel was entitled to remove $10,000 from the escrowed funds for each month that the closing date was extended in accordance with the parties' course of dealing. For this reason, the Deposit has been reduced to zero and N.S.R.I. is entitled to no refund.

## CONCLUSION

N.S.R.I., a party to a prepetition executory contract, was a creditor of M.A.S. M.A.S. thus was under an obligation to provide N.S.R.I. with notice of its bankruptcy by including it on its schedules and creditor matrix. Although the Debtor breached this obligation, the Court finds that the lack of notice did not harm

N.S.R.I. Finally, the last extension of the closing date, from September 30, 2003 to December 31, 2003 in fact represented three separate extensions, leaving no part of the escrowed funds to be refunded to N.S.R.I. The Debtor's Objection to the Claim of N.S.R.I. [Docket # 208] is SUSTAINED and N.S.R.I.'s Request for Payment of Administrative Claims [Docket # 213] is DENIED.